UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORZELL LONG,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CITY OF SAN FRANCISCO, et al.,<br><br>　　　　Defendants. | Case No. 12-cv-01424-JCS<br><br>**ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REMANDING TO STATE COURT**<br><br>**Dkt. No. 41** |

## I.　INTRODUCTION

Plaintiff Orzell Long ("Plaintiff") filed this action against the City of San Francisco and Chief of Police Greg Suhr ("Defendants") asserting claims under 42 U.S.C. § 1983 and state tort law. Plaintiff's claims arise out of an incident on June 29, 2011 in which Plaintiff was arrested after police were called to respond to a domestic violence dispute at his home, and items were missing from Plaintiff's home after he returned from the police station. Defendants have filed a Motion for Summary Judgment ("Motion"). A hearing on the Motion was held on August 30, 2013. For the reasons stated below, Defendants' Motion for Summary Judgment is GRANTED in part with respect to the § 1983 claims.[1] The remaining claims in the case are remanded to state court.

## II.　BACKGROUND

### A.　Factual Background[2]

　　1.　Report of Domestic Violence at Plaintiff's Residence

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

[2] Unless otherwise noted, the Court cites to evidence which it found to be undisputed.

On the morning of June 29, 2011, Plaintiff was at his home at 206 Blythedale Avenue in San Francisco with a woman named Penny Brown ("Brown"). Declaration of Duncan Carling in Support of Defendants' Motion for Summary Judgment ("Carling Decl."), Exhibit ("Ex.") F (Deposition of Plaintiff Orzell Long) ("Pl. Depo.") at 41:11-23. Brown had spent the night at Plaintiff's house. *Id*. at 42:2-4. Although it is not clear whether or not Brown was Plaintiff's girlfriend, Plaintiff testified at his deposition that at that time, he had known Brown for about three to four years, and that the two of them had previously had sex. *Id*. at 42:18-19 - 43:6-12.

Between 7:30 a.m. and 8:30 a.m., Plaintiff "woke up to an argument" with Brown. Pl. Depo. at 41:22. Plaintiff heard Brown call 911 and say: "Could you send police to 206 Blythedale? My boyfriend put his hand on me." *Id*. at 61:6-9. Plaintiff went outside the apartment and called 911 from his phone. *Id*. at 63:17-24. Plaintiff told the 911 operator that he was "inquiring about a 911 call my girlfriend had made." *Id*. at 64:13-16, 68:11-16. The operator told Plaintiff to stay where he was, and that the police officers would be there shortly. *Id*. at 71:14-17.

At approximately 9:00 a.m., Officers Smethurst and Abucay ("the Officers") received a Computer Aided Dispatch ("CAD") from the City's Emergency Communications Department as a result of the 911 calls from 206 Blythedale Avenue. Declaration of Jeffrey Smethurst in Support of Defendants' Motion for Summary Judgment ("Smethurst Decl.") ¶ 3. The CAD indicated that Plaintiff had called 911 and could be heard arguing with his girlfriend. Smethurst Decl. ¶ 3 & Ex. A (CAD Event History). The 911 dispatcher also stated that the girlfriend could be heard in the background saying that Plaintiff would not leave her. *Id*. Based on all of the information received during the 911 call, the dispatcher coded the dispatch a "418DV," which is the code for a domestic violence fight with no indication that weapons are involved. *Id*.

The CAD also indicated that there were two prior 418DV calls for Plaintiff's address. Smethurst Decl. ¶ 3 & Ex. A. One of the prior 911 domestic violence calls was on June 20, 2011, only nine days before the call on June 29, 2011. *Id*. At his deposition, Plaintiff did not specifically recall the incident on June 20, 2011, but he did recall that the police had been to his apartment twice before. *Id*. at 53:3-10. Plaintiff also recognized his and Brown's voices on the

recordings of the phone calls made to 911 on June 20, 2011. *Id*. at 56:5-6, 18-19.

### 2. Officers Interview Brown and Determine Probable Cause

When the Officers arrived at 204 Blythedale, they saw Plaintiff standing outside the front door of his apartment. Smethurst Decl. ¶ 4; Pl. Depo. at 73:13-17. Officer Abucay remained outside with Plaintiff, and Officer Smethurst went inside to locate and interview Brown. Smethurst Decl. ¶ 4; Pl. Depo. at 76:12-25. According to Officer Smethurst, Brown told him that Plaintiff was her boyfriend and that they began to argue because Plaintiff was cheating on her with a woman who had AIDS. Smethurst Decl. ¶ 4. Brown said she told Plaintiff she wanted to leave the apartment, but that Plaintiff would not let her leave. *Id*. Brown said that Plaintiff physically grabbed her and threw her down on the bed. *Id*. As Plaintiff got up, Brown threw her down on the bed a second time. *Id*. Plaintiff could hear Brown and Officer Smethurst talking inside the apartment while he was outside, but he could not hear what one was saying to the other. *Id*. at 82:20-25.

Officer Smethurst examined the bedroom and asked Brown to walk him through what happened. Smethurst Decl. ¶ 5. The bedroom appeared to be in a state of disarray, which Officer Smethurst considered "not inconsistent" with Brown's account of the incident. *Id*. Officer Smethurst wrote in his declaration that Brown appeared scared, and he found her account of the incident to be credible. *Id*.

Officer Smethurst was the Field Training Officer for Officer Abucay, and was therefore responsible for grading Officer Abucay and providing him feedback. Smethurst Decl. ¶ 6. Officer Smethurst wanted Officer Abucay to independently interview Brown. *Id*. Officer Abucay went inside the house and interviewed Brown. Declaration of Officer Oscar Abucay in Support of Defendants' Motion for Summary Judgment ("Abucay Decl.") ¶ 5; Pl. Depo. at 78:17-79:5. According to Office Abucay, Brown told him that she and Plaintiff argued because she believed he was cheating on her, that she wanted to leave the apartment but Plaintiff would not let her go, and that Plaintiff threw her on the bed two times. Abucay Decl. ¶ 5. Officer Abucay also observed that the bedroom was a in a state of disarray not inconsistent with Brown's version of the event. *Id*. ¶ 6. Officer Abucay also believed Brown was scared and found her account of the incident to

be credible. *Id.*

After Officer Abucay interviewed Brown, the Officers compared notes and found that Brown's description of the incident to both of them had been consistent. Smethurst Decl. ¶ 6. The Officers determined that there was probable cause to arrest Plaintiff for violating California Penal Code § 243(e)(1). *Id.*; Abucay Decl. ¶ 6.

### 3. Officers Arrest Plaintiff

Officers Abucay handcuffed Plaintiff at Officer Smethurst's instruction and walked him to the police car. Abucay Decl. ¶ 7; Pl. Depo. at 86:15-21. Officer Abucay wrote in his declaration: "Mr. Long seated himself in the car without incident, and no force was used to place Mr. Long in the vehicle. At no time did Mr. Long indicate that he suffered some injury as a result of getting into the patrol car." Abucay Decl. ¶ 7. While Plaintiff also asserts excessive force on the basis of Office Abucay's use of handcuffs, Plaintiff also admitted at his deposition that he did not tell the Officers that his handcuffs were too tight. Pl. Depo. at 93:9-10.

Plaintiff testified in his deposition that Officer Abucay "roughly and tightly" handcuffed him. Pl. Depo. at 86:9-10. Plaintiff also accuses Officer Abucay of using excessive force when "shoving" him in the police car, causing Plaintiff injury to his knee and back:

> Caucasian officer then compelled the Asian officer who (ruffly) [sic] and (tightly) handcuffed me and shoving me to police car as he reached forward with his right hand to open rear door of police car, he yanked on the handcuff with his left hand and with (force) of turning me to the right side as I began to stoop down to enter car, officer then use (excessive force) with both hands on top of my head pushing me downward, my left-knee buckled which balance of weight became lost and cause me to hit tail joint of (my back) on metal frame of police car door!

Carling Decl. Ex E (Initial Disclosures) at 7; *see also* Plaintiff's Memorandum of Law, Opposition of Summary Judgment) ("Pl. Opp.") at 12. Plaintiff also accuses Officer Abucay of refusing him to retrieve his medical knee brace before getting in the police car. Pl. Opp. at 13-14. Plaintiff also states that he complained of his these injuries after being booked at the police station, but that his complaints were ignored:

> After I was booked and hands printed, I was screened by medical receptionist, I was complaining [sic] of (Low Back pain and Hands with wrists numbness which HE respond "Don,t [sic] be such a big

baby, it will go away tomorrow!

Pl. Opp. at 15.

There are unauthenticated documents in the record which show that over a month after the June 29, 2011 incident, on August 6, 2011, Plaintiff was diagnosed with a lumbar strain/contusion in his lower back by a doctor at the Saint Francis Memorial Hospital. Pl. Facts at 17 (Emergency Report). Further documentation defines a contusion as "a bruise with swelling and some bleeding under the skin" and states that it "takes a few days to a few weeks to heal." Pl. Facts at 17 (Discharge Instructions). The medical report does not indicate the cause of his contusion, though Plaintiff claims it is a result of Officer Abucay's handling of him on June 29. 2011. Carling Decl. Ex. E at 12.

Another unauthenticated document shows that Plaintiff had knee surgery on February 19, 2010. Pl. Opp. at 14. Other documentation shows that Plaintiff currently suffers from neck pain and pain in his left knee. A letter by Benjamin Jiawei Lee, M.D., a doctor from the UCSF Medical Center, states: "This letter affirms that Mr. Orzell is under my care for his chronic neck and left knee pain." Pl. Opp. at 18.

4. <u>Plaintiff Instructs the Officers to Lock his Home before Taking him to Jail</u>

The door to Plaintiff's apartment can be locked without a key by using the small knob on the inside doorknob that can be turned, causing the door to lock when closed. Pl. Depo. at 138:6-139:24. When Plaintiff was outside his apartment before his arrest, he had a key in his possession that would lock a steel gate in front of his door. Pl. Depo. at 140:15-19.

It is undisputed that when Plaintiff was in the police car, he shouted to Officer Smethurst "to make sure my house door was locked before hauling me off to jail," and that "Brown did not have the right to be on [his] property because she was not on the rental lease." Pl. Depo. at 140:15-19, 142:9-19. It is also undisputed that Plaintiff gave one of the Officers the key to his gate, instructed the Officers to give the key to his neighbor Brandy Zachare, and that he yelled to Zachare from the patrol car: "Make sure you give it to Brianna to lock my door." Pl. Depo. at 152:7-8. Brianna is the daughter of Yolanda, who is related to Zachare. Pl. Depo. at 152:12-13.

The parties dispute, however, whether the Officers locked the gate before giving the key to

5

Zachare and whether Brown exited the apartment before the Officers drove Plaintiff to jail. According to the Officers, Officer Smethurst asked Brown to gather her belongings and leave the apartment. Smethurst Decl. ¶ 8; Abucay Decl. ¶ 9. Both Officers observed Brown exit the apartment. *Id*. After Brown exited the apartment, Plaintiff gave the key to Officer Abucay, who locked the gate and then gave the key to Zachare as requested. Smethurst Decl. ¶ 8; Abucay Decl. ¶¶ 8-9.

According to Plaintiff, while he was seated in the police car, he gave the key to Officer Smethurst and told him to give the key to Zachare to lock the gate. Pl. Depo. at 144:9-145:4, 146:7-8. Plaintiff observed Officer Smethurst walk towards Zachare and give her the key. *Id*. at 149. Plaintiff never observed Brown exit the apartment. *Id*. at 159. Plaintiff testified that while he could not see the front door of his apartment, it would have been impossible for Brown to have left the apartment without him seeing her. *Id*. Plaintiff states that the door to his apartment was not locked when he was driven away to the police station, and that the police officers told him that they would take full responsibility if something were to happen. Carling Decl. Ex. A (Complaint) Ex. A (Government Claim).

When Plaintiff returned from the police station, he retrieved his key from Yolanda, Brandy's cousin and Brianna's mother. Pl. Depo. at 151:11-16, 152:12-13. Plaintiff entered into his apartment and realized that his Xbox, jewelry, watches, narcotics medicine, and other items were missing. *Id*. at 190:8-11; 198:5-6; 210:5-8.

### B. Procedural History

On November 29, 2011, Plaintiff filed this lawsuit with the assistance of an attorney in the Superior Court for the State of California, County of San Francisco. Dkt. No. 1 (Notice of Removal), Ex. A (Complaint). The initial complaint contained five state law tort claims for negligence, false imprisonment, assault and battery, intentional infliction of emotional distress and conversion. *Id*.

Defendants filed a motion in Superior Court to strike paragraphs 33 and 36 asserted in support of Plaintiff's claim for assault and battery. Carling Decl., Ex. G (Defendants' Motion to Strike). Paragraph 33 alleged: "Despite Plaintiff's willingness to submit to arrest, defendants

1   shoved plaintiff into the police car causing plaintiff to injury his back." Complaint ¶ 33.

2   Paragraph 36 alleged: "Plaintiff suffered trauma to his back as a results [sic] of defendants' actions

3   and had to go to the hospital to seek treatment for his injuries." *Id.* ¶ 36.

4       Under the California Government Claims Act, Plaintiff was required to file a claim to put

5   the City on notice of the allegations asserted against it. *See* Cal. Gov't Code §§ 905, 910; *see also*

6   *Nelson v. State of California*, 139 Cal.App.3rd 72, 79 (1982) ("the factual circumstances set forth

7   in the written claim must correspond with the facts alleged in the complaint"). While Plaintiff

8   submitted a government claim alleging that he was falsely arrested and burglarized during his

9   incarceration, Defendants argued that Plaintiff did not put the City on notice that Plaintiff would

10  allege the Officer used any unreasonable force or caused him physical injury.  Carling Decl., Ex.

11  G.

12      The Superior Court agreed with Defendants. On February 15, 2012, the Honorable Harold

13  E. Kahn issued an order striking certain allegations of excessive force and back injury from

14  Plaintiff's complaint, and "barr[ing Plaintiff] from proceeding on allegations of excessive force

15  and back injury in this case." Carling Decl., Ex. B (Order Granting Defendant's Motion to Strike).

16      On February 16, 2012, Plaintiff filed a First Amended Complaint, which is now the

17  operative complaint in this lawsuit. Carling Decl., Ex. D (First Amended Complaint) ("FAC").

18  There seven claims in Plaintiff's First Amended Complaint: (1) negligence; (2) false

19  imprisonment; (3) assault and battery; (4) intentional infliction of emotional distress; (5)

20  conversion; (6) violation of 42 U.S.C. § 1983 for violating Plaintiff's right to be free of

21  unreasonable search and seizure; and (7) violation of 42 U.S.C. § 1983 by failing to train officers

22  to not infringe upon Plaintiff's constitutional rights.

23      In compliance with the Superior Court's order, the First Amended Complaint does not

24  contain the stricken paragraphs 33 and 36 in support of Plaintiff's claim for assault and battery.

25  However, in support of the § 1983 claim for violations of Plaintiff's Fourth Amendment rights,

26  Plaintiff included paragraphs 53 and 56, which are almost identical to paragraphs 33 and 36:

27          Although plaintiff submitted to arrest without incident, defendants
        shoved plaintiff into the police car causing plaintiff to injury his
28          back.

> Plaintiff suffered physical trauma, in addition to pain and suffering, as a result of defendants' actions and had to go to the hospital to seek treatment for his injuries.

FAC ¶¶ 53, 56.  These allegations form the basis of Plaintiff's excessive force claim.

After Plaintiff asserted § 1983 claims in his First Amended Complaint, Defendants removed this case to federal court.  *See* Dkt. No. 1 (Notice of Removal).  Shortly after Defendants removed the action to federal court, Plaintiff began to represent himself *pro per*.  *See* Dkt. Nos. 7-9.

### C. Defendants' Motion for Summary Judgment

Defendants move for summary judgment on all of Plaintiff's claims.  Dkt. No. 41 (Defendants' Notice of Motion and Motion for Summary Judgment; Memorandum of Points and Authorities) ("Def. Motion").  Defendants contend that all of Plaintiff's claims fail because there is no admissible evidence in the record supporting any of his claims.  Moreover, Defendants contend that because Plaintiff only asserted § 1983 claims against the City of San Francisco and the Chief of Police in his official capacity, the § 1983 claims fail because Plaintiff has no evidence that the City has a policy or custom that was the moving force behind any constitutional violations, as required by *Monell v. Department of Social Services of New York*, 436 U.S. 658, 691 (1978).

Defendants also argue the state law tort claims fail for various reasons.  According to Defendants, the claim for false imprisonment fails because Officers Smethurst and Abucay had probable cause to arrest Plaintiff, and therefore, are immune under California Penal Code § 847. The claim for assault and battery fails because pursuant to the Superior Court's order, Plaintiff may only allege battery on the basis of handcuffing (not on the basis of his back injury), and the handcuffing was a reasonable use of force.  Defendants argue Plaintiff's claim for conversion fails because there is no evidence that the Officers exercised dominion or control over Plaintiff's property.   Finally, Defendants contend that the claims for negligence and intentional infliction of emotional distress fail because Defendants enjoy immunity under California Government Code § 821.6, and because the claims are unsupported by evidence.

### III. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Where the moving party has met its burden, the opposing party must present specific facts demonstrating that there is a factual dispute about a material issue." *Program Eng'g, Inc. v. Triangle Publications, Inc.*, 634 F.2d 1188, 1193 (9th Cir. 1980). On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

While allegations from a *pro se* litigant are to be liberally construed, *see Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010), the Ninth Circuit has also held that "*pro se* litigants in the ordinary civil case should not be treated more favorably than parties with attorneys of record." *Jacobsen v. Filler*, 790 F.2d 1362, 1364 (9th Cir. 1986) (holding that the district court had no duty to advise a *non*-prisoner *pro se* litigant of his obligation to file an opposition to the defendant's motion for summary judgment and submit admissible evidence). Where, as here, the "litigant …chooses *himself* as a legal representative," the Ninth Circuit has held that Plaintiff "should be treated no different." *Id.* at 1365 ("it is not for the trial court to inject itself into the adversary process on behalf of on class of litigant" because "[d]oing so necessarily implicates the court's impartiality and discriminates against opposing parties who do have counsel.").

### IV. DISCUSSION

Defendants' overarching argument is that Plaintiff failed to submit any evidence in support of his opposition to Defendants' Motion that would be admissible at trial. Defendants are correct. To meet the evidentiary requirements of Rule 56, documents "are required to be authenticated by affidavits or declarations of persons with knowledge through whom they could be introduced at trial." *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). No affidavit or declaration has been submitted to authenticate any document submitted by Plaintiff. On this basis, the Court dismisses Plaintiff's Section 1983 claims.

9

1    However, assuming that every written statement submitted by Plaintiff constitutes
2    admissible evidence, Defendants are still entitled to summary judgment with respect to the § 1983
3    claims.  The Court declines to exercise supplemental jurisdiction with respect to the remaining
4    state law claims.

**A.    Section 1983 Claims**

Section 1983 subjects government entities and officials to civil liability if, acting under the color of law, they deprive someone of the rights accorded to them by federal law or the United States Constitution.  *See* 42 U.S.C. § 1983.  Section 1983 is the vehicle by which a plaintiff may assert a claim that the government deprived him or her of constitutional rights.  In this action, Plaintiff alleges that Defendants violated his Fourth Amendment rights to be free of unreasonable search and seizure by using excessive force when arresting him during the June 29, 2011 incident. FAC ¶¶ 47-62.

The only named Defendants in this action are the City of San Francisco and Greg Sur, the Chief of Police of the City's Police Department.  Plaintiff never named or served any individual officers present at the scene.  While Plaintiff does not specify whether Defendant Sur is sued in his official or personal capacity, there is no indication that he is sued in any other than his official capacity as the Chief of Police.[3]  "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *see also Monell*, 436 U.S. at 691 ("official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent").  Plaintiff is therefore required to present evidence that the City of San Francisco violated his constitutional rights.

When a plaintiff asserts a § 1983 claim against a government entity, the plaintiff must prove that "the entity itself is a 'moving force' behind the deprivation" of constitutional rights. *Graham*, 473 U.S. at 166 (citing *Monell*, 436 U.S. at 691).  "[A] municipality may not be held liable under § 1983 solely because it employs a tortfeasor."  *Bd. of Cnty. Comm'rs of Bryan Cnty.,*

---

[3] Plaintiff only served the First Amended Complaint upon the City's attorney, and never individually served Defendant Sur.  Defendant Sur was also not present during the June 29, 2011 incident, and Plaintiff does not assert any factual allegation against him−other than his failure to adequately train subordinate officers.  *See* FAC ¶¶ 58-61.

*Okl. v. Brown*, 520 U.S. 397, 403 (1997) (stating that courts will not "hold municipalities liable under a theory of *respondeat superior*"). Rather, a plaintiff seeking to impose liability on a municipality under § 1983 must identify a municipal "policy" or "custom" that caused the plaintiff's injury. *See Monell*, 436 U.S. at 694. This "ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body" or for a "practice so widespread as to have the force of law." *Brown*, 520 U.S. at 403-04 (citing *Monell*, 436 U.S. at 694).

Plaintiff appears to base his *Monell* claim on the City's alleged failure to adequately train police officers. While "the inadequacy of police training may serve as the basis for § 1983 liability," this is only the case "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police came into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id*. at 389. "[T]he focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Id*. at 390. "[A]dequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." *Id*. at 391.

Plaintiff's documents do not support a *Monell* claim against the City of San Francisco for violating Plaintiff's rights. There are no documents that support Plaintiff's allegations that the police officers were inadequately trained, or that the City of San Francisco had a policy or custom of violating the Fourth Amendment. Plaintiff alleges in the First Amended Complaint that the officers were inadequately trained because "SFPD officers were videotaped trespassing into citizen's homes in the spring of 2011." FAC ¶ 60. Plaintiff also writes in his Statement of Facts that ABC news reported on February 9, 2012 that "a troubling cell phone video showing an officer repeatedly punching a subdued suspect has drawn criticism from public voices including San Francisco Public Defender; Jeff Adachi." Pl. Facts.

Even if there were evidence supporting such allegations, it would be insufficient to show

any "policy or custom" that is the cause of Plaintiff's alleged constitutional injuries. First, unlawful trespass is entirely unrelated to Plaintiff's alleged injury. *See City of Canton*, 489 U.S. at 391 ("for liability to attach … the identified deficiency in a city's training program must be closely related to the ultimate injury"). An incident of unlawful trespass does not show inadequate training that caused Plaintiff's rights to be violated.

Second, the fact that some police officers used excessive force upon a subdued individual, does not, by itself, show inadequate training. "[A]dequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." *Id*. at 391. At best, Plaintiff refers to another incident of excessive force that bears no relation to his own allegations. Plaintiff took no discovery in an attempt to show that SFPD officers are inadequately trained on the reasonable use of force.

As a final matter, the Court notes that the documentation of Plaintiff's medical injuries one month after trial is not evidence that the City of San Francisco had a policy or custom to use excessive force when arresting individuals. As explained above, "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Brown*, 520 U.S. at 403. Thus, even if Officers Smethurst and Abucay used excessive force while arresting him and putting him in the police car, there would still be no basis to hold the City of San Francisco liable under a *Monell* theory.[4]

---

[4] Plaintiff did not assert any claims against Officers Smethurst and Abucay as individuals, thus the Court is not called upon to determine whether Officer Smethurst and/or Officer Abucay violated Plaintiff's constitutional rights. Plaintiff has also not sought leave to amend his First Amended Complaint in order to assert any claims against these Officers.

Assuming, at this late date, that Plaintiff sought to amend in order to assert claims against the Officers, the Court would deny such a request. Pursuant to this Court's Scheduling Order, Plaintiff was required, by July 6, 2012, to file a Case Management Statement which included "[t]he extent to which parties … are expected to be added … and a proposed deadline for amending the pleadings." Dkt. No. 2 at 2, 6. Plaintiff did not file a Case Management Statement by July 6, 2012, as he was required to do. Plaintiff did submit a Case Management Statement on October 16, 2012, but Plaintiff represented in this Statement that he did not anticipate having to amend his pleadings. *See* Dkt. No. 23 at 6. This case was filed nearly 18 months ago. The Court also set a schedule in the case, and required that all expert and non-expert discovery be completed by April 26, 2013. The Court scheduled dispositive motion briefing to commence thereafter, and a hearing on August 30, 2013. To allow Plaintiff to amend in order to name the individual Officers would unduly prejudice Defendants, who have relied on the fact that Plaintiff only asserted a *Monell* claim. *See* Def. Motion at 8-10.

Accordingly, Defendants are not liable under § 1983.

### B. State Law Claims

This Court may exercise "supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). The Court may also, however, "decline to exercise supplemental jurisdiction over a claim" if:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). To decide whether to exercise jurisdiction over pendent state law claims, a district court should "consider and weigh in each case, and at every stage of litigation, the values of judicial economy, convenience, fairness, and comity…" *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 349-350 (1988). "[I]n the usual case in which all federal law claims are eliminated before trial, the balance of the factors to be considered … will point toward declining to exercise jurisdiction over the remaining state-law claims." *Satey v. JPMorgan Chase & Co.*, 521 F.3d 1087, 1091 (9th Cir. 2008) (quoting *Cohill*, 484 U.S. at 351).

The Court will decline to exercise supplemental jurisdiction over the remaining state law claims in this case. All federal claims in this case will be dismissed with the issuance of this Summary Judgment Order. *See Gibbs*, 383 U.S. at 726 ("if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."). Balancing the *Gibbs* factors, the Court concludes that the interests of judicial economy, comity, fairness, and convenience will be best served by remanding the remaining claims in this case to back to state court.

### V. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is GRANTED with respect to the § 1983 claims. The Clerk is directed to remand this case back to Superior Court for the State of California, County of San Francisco, for adjudication on Plaintiff's state law

13

claims.

IT IS SO ORDERED.

Dated: September 6, 2013

_____
JOSEPH C. SPERO
United States Magistrate Judge